UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GRAMMER INDUSTRIES, INC.,

        Plaintiff,                              No. 15-12694

v.                                         District Judge Paul D. Borman
                                              Magistrate Judge R. Steven Whalen

BEACH MOLD AND TOOL, INC.,
ET AL.,

        Defendants.
_____/

**REPORT AND RECOMMENDATION**

Before the Court is Plaintiff Grammer Industries, Inc.'s Motion for Partial Summary Judgment [Doc. #114], which has been referred for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B). For the reasons and under the terms discussed below, I recommend that the motion be GRANTED IN PART AND DENIED IN PART as to Defendant Beach Mold and Tool, Inc.

**I.    FACTS**

Plaintiff Grammer Industries, Inc., ("Plaintiff") is a South Carolina corporation, with its principal place of business in Troy, Michigan, that supplies automotive assemblies to automotive manufacturers. Defendant Beach Mold and Tool, Inc. ("Beach Mold") is a corporation located in Indiana that manufactures tooling and parts that are molded from that tooling. In its Third Amended Complaint ("TAC")[Doc. #68], Plaintiff alleges that it contacted Beach Mold regarding a quote to build tools, and for future consideration to build parts with those tools, that Plaintiff would use in a potential contract with a Fiat Chrysler, LLC ("FCA") program. TAC, ¶ 17. Plaintiff alleges that

Beach Mold issued a price quotation to Grammer, providing that the tooling would be built at Beach Mold's Indiana facility, and the parts would be "manufactured at our Queretaro, Mexico Facility." *Id*. ¶ 18.  Plaintiff also contracted with Advance Mold Incorporated to manufacture a fixture that would be used to produce parts at the Mexico facility, and that fixture was delivered to Beach Mold.  *Id*. ¶ 21.[1]

Plaintiff alleges that the purchase orders from Beach Mold "formed the Contract between Grammer and Beach Mold." *Id*. ¶ 25.

Plaintiff states that FCA placed the program on hold, and in 2015 requested proof of possession of the tooling; in turn, Plaintiff requested the tooling from Beach Mold.  *Id*. ¶ 27.  In response, Beach Mold informed Plaintiff "that the assets of the Mexico Facility, including the Tooling, had been sold and/or transferred to iP3 Mexico." *Id*. ¶ 28. Plaintiff claims that because Beach Mold did not return the tooling to it, or even provide evidence that it was available for possession, Plaintiff had to reimburse FCA for the tooling.  *Id*. ¶ 29.

In August of 2007, Beach Mold issued purchase orders to Plaintiff, which provided that Beach Mold would manufacture certain tools, and take possession of additional tools that were manufactured by a third party.  Attached to Plaintiff's motion as Exhibit A are the purchase orders issued by Beach Mold.  The orders state (1) that they are for the "Chrysler RT Booster Program;" (2) that "the supplier [Beach Mold] has quoted the design and manufacture of the tool in New Albany, IN and the molding from Queretero, Mexico.  The supplier is responsible for the shipment and delivery of the tool from New Albany, in to Queretaro, Mexico;" and (3) that the supplier (Beach Mold)

---

[1] In its answer to the TAC, Beach Mold admits that the tooling was shipped to Beachmold Mexico for production of parts, "with Grammer's agreement." *Answer* [Doc. #80], ¶ 26.

remains AAR responsible for the components and tooling through the life of the project."

Beach Mold shipped the tools, including the so-called "Top Hat Tool" that was manufactured by Advance Mold Incorporated, the third party, to Mexico. The purchase order regarding the Top Hat, Plaintiff's Ex. A, Pg. ID 2083, states, "the Top Hat Tool will run in production at Beach Mold in Queretero Mexico."

Plaintiff's Exhibit B is a price quotation from Beach Mold, stating that pricing was "based on parts being manufactured at our Queretaro, Mexico facility."

Plaintiff's Exhibit R is the affidavit of James Beal, Plaintiff's Senior Buyer. Mr. Beal states that "Beach Mold represented to that it had multiple manufacturing plants, including in New Albany, Indiana, and in Queretaro, Mexico (the 'Mexico Facility')." *Beal Affidavit*, ¶ 5. He states that "[n]owhere in the Quotation did Beach Mold identify the Mexico Facility as a separate legal entity." *Id*. ¶ 7. He states further that "[w]hen he requested return of the Tooling after FCA placed the program on hold, Beach Mold responded that the Tooling could not be located," *Id*. ¶ 13, and that "[p]rior to Grammer's request for the Tooling, no representative of Beach Mold advised Grammer that Beach Mold's Mexico Facility had not been previously owned and controlled by Beach Mold." *Id*. ¶ 14. He indicates that the value of the tooling is $136,560.00. *Id*. ¶ 15.[2]

Tammy Rickard, the account manager for Beach Mold, was deposed on June 29, 2016. Her deposition transcript is attached to Plaintiff's motion [Doc. #114] as Exhibit D. Ms. Rickard testified that in general, tooling would be either manufactured at Beach Mold's Indiana facility, or manufactured by a third party and delivered to the Indiana facility. Then, parts that were fabricated using that tooling would be manufactured at

---

[2] In its answer [Doc. #80], at ¶ 49, Beach Mold admits that Plaintiff requested to return of the possession of the tooling.

either the Indiana or the Mexican facility. *Rickard Dep*. at 13, Pg. ID 2098. She testified that she was not party to any "internal discussions" as to how Beach Mold would represent the facility in Queretaro, Mexico. *Id*., at 15, Pg. ID 2099. In terms of how she "generally" represented the relationship between Beach Mold and the Queretaro facility, she testified as follows:

> Q: And I'm starting just generally. How did you represent the relationship to customers concerning the Beach Mold operation in the U.S. and the manufacturing facility in Mexico?
>
> A: That we had capabilities to produce parts in Mexico.
>
> Q: When you said–when you say "we," who are you referring to?
>
> A: That our company was able to produce parts in Mexico. It wasn't under Beach Mold and Tool, but we had a relationship with a company that could produce parts in Mexico.
>
> Q: All right. Well, I want to just ask you a little more specifically about that. You initially said that you would represent to customers that you had capability for production in Mexico, correct?
>
> A: Yes.
>
> Q: Okay. And that would've been Beach Mold having capability, correct?
>
> A: I feel that's kind of a double sided question. I mean, I–we would have–we had a Beach Mexico, which was not a Beach Mold owned company. It was an affiliation, so to speak.
>
> Q: So was it your general practice to explain that to customers?
>
> A: I didn't go into details myself, no. It was listed as a option, but it was clearly listed as Beachmold Mexico, not Beach Mold and Tool. *Id*. at 16-17, Pg. ID 2099.

Ms. Rickard identified a printout of Beach Mold's website that stated at the first sentence, "Beach Mold and Tool has brought total solutions capability south of the border with its newest facility in Queretaro, Mexico." *Id*. at 18, Pg. ID 2100. She further testified:

> Q: Okay. Now, in any of your prior positions in working with customers, did you have any reason to discuss Beach Mold and Tool's newest facility in Queretaro, Mexico, as it's stated in the website?
>
> A: Yes.
>
> Q: Okay. And how did you discuss that new facility in Queretaro?
>
> A: That we had a location in Mexico that could produce parts in that location.
>
> Q: Okay. Now, do you know whether in the website it was ever stated that the Beach Mold and Tool Queretaro, Mexico facility was not part of Beach Mold and Tool?
>
> A: I have no idea. *Id*. at 19, Pg. ID 2100.

Ms. Rickards recalled discussing that Beach Mold and Beach Mold Mexico were separate legal entities with some customers, specifically Continental/Siemen's Video and Johnson Controls. She did not testify that she specifically had any such discussion with Grammer. She could not recall any particular person that she talked to at these other companies, adding, "It's been so long since I dealt with them, I don't even remember any name." *Id*. at 21-22, Pg. ID 2100-2101. She testified that she did not recall providing anything in writing or seeing anything in writing to a customer explaining that the Beach Mold Mexico was a separate corporate entity. *Id*.[3]

---

[3] In its response brief [Doc. #138], at p. 16, Pg. ID 3174, Beach Mold asserts that "Tammy Rickard testified that she told customers that the facility in Mexico was owned by an affiliate, not by Beach Mold & Tool." That assertion is misleading. The portion of Ms. Rickard's testimony cited, at pp. 16-17, indicates that she told customers "[t]hat we had the capabilities to produce parts in Mexico." Her subsequent statement that "[i]t wasn't under Beach Mold and Tool, but we had a relationship with a company that could produce parts in Mexico," was explanatory in the deposition, but cannot be fairly construed as something she told customers; later still, she testified that she did "not go into details" about Beach Mold's relationship with the Mexican facility, but that it "was listed as an option." There has been no evidence produced showing that the corporate status of Beachmold Mexico was listed anywhere, and certainly not on Beach Mold's website, which referred to "*its* newest facility in Queretaro, Mexico." (Emphasis added).

Referring to language in the purchase orders indicating that Beach Mold "remains AAR responsible for the components and tooling for the life of the project," Ms. Rickards explained, "AAR refers to the appearance acceptance requirements. So that means we would be responsible to make a quality part for the life of the program." *Id*. at 33, Pg. ID 2103.

In response to Requests for Admission, Beach Mold admitted that it did not return the tooling to Plaintiff in Michigan. *Request for Admission No. 1*, Plaintiff's Exhibit E, Pg. ID 2114. In its answer to Interrogatories, Beach Mold stated that Beachmold Mexico was owned by Beach Industries, LLC and a Beach grandchildren trust, and that there are "Beach family members who hold an interest in Beach Industries." *Interrogatory No. 1*, Plaintiff's Exhibit F, Pg. ID 2121. Beach Mold's interrogatory response further states:

> "In 2012 the ownership interests in Beachmold Mexico were sold by Beach Industries and the Trust to iP3. It was the following year when Grammer asked Beach Mold & Tool to return the Tooling. There had been a relationship between Beach Mold & Tool and Beachmold Mexico prior to the sale in 2012. But after the ownership of Beachmold Mexico was sold to iP3, Beach Mold & Tool had no ability to recover the Tooling for Grammer." *Id*.

In the TAC, Plaintiff brings claims of breach of contract (Count I) and conversion (Count II) against Beach Mold.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990).

Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate. *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

Once the moving party in a summary judgment motion identifies portions of the record which demonstrate the absence of a genuine dispute over material facts, the opposing party may not then "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative evidentiary showing to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). The non-moving party must identify specific facts in affidavits, depositions or other factual material showing "evidence on which the jury could *reasonably* find for the plaintiff." *Anderson*, 477 U.S. at 252 (emphasis added). If the non-moving party cannot meet that burden, summary judgment is proper. *Celotex Corp.*, 477 U.S. at 322-23.

### III. DISCUSSION

#### A. Breach of Contract

##### 1. There was a Bailment Agreement

Plaintiff alleges breach of a bailment contract. *Motion* [Doc. #114], at 16-17, Pg. ID 2064-65.

"The elements of a 'bailment' under Michigan law require that one person deliver personal property 'to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished.'" *Crestmark Bank v. Electrolux Home Prod., Inc.*, 155 F. Supp. 3d 723, 742 (E.D. Mich. 2016), quoting *In re H.S.H. II Inc.*, 2002 WL 32819769, at *3 (E.D.Mich. Sept. 30, 2002). A bailment contract may be express or implied, formal or informal. In *Godfrey v. City of Flint*, 284 Mich. 291, 297, 279 N.W. 516, 518 (1938), the Michigan Supreme Court, quoting with approval 6 Amer.Juris. p. 206, § 81, stated:

> "'It is clear from the decisions that matters of form are usually of slight significance as far as the validity of a contract of bailment is concerned. So long as the lawful possession of property is in the bailee, under circumstances which impose upon him the duty to return or account for it, there appears to be no disposition on the part of the courts to regard it as any the less a bailment because the agreement was informal in character, oral or implied in fact or in law.'"

In *Carpenter v. United States*, 138 S. Ct. 2206, 2268 (2018), the Supreme Court put it more simply: "Entrusting your stuff to others is a bailment." The Court then expanded on the concept of bailment:

> "A bailment is the 'delivery of personal property by one person (the bailor) to another (the bailee) who holds the property for a certain purpose.' Black's Law Dictionary 169 (10th ed. 2014); J. Story, Commentaries on the Law of Bailments § 2, p. 2 (1832) ('a bailment is a delivery of a thing in trust for some special object or purpose, and upon a contract, expressed or

> implied, to conform to the object or purpose of the trust'). A bailee normally owes a legal duty to keep the item safe, according to the terms of the parties' contract if they have one, and according to the 'implication[s] from their conduct' if they don't. 8 C.J. S., Bailments § 36, pp. 468–469 (2017)."

In this case, Plaintiff entrusted their stuff (the tooling) to Beach Mold, for the specific purpose of the manufacture of parts that Plaintiff would provide to FCA pursuant to FCA's RT Project. That purpose is clearly stated in the Beach Mold purchase orders. Beach Mold had an obligation to keep the tooling safe, both by the language of the purchase agreements and by their necessary implication. That would include the duty to return the tooling to Plaintiff on request. In short, Plaintiff (the bailor) had a bailment contract with Beach Mold (the bailee).

### 2. Beach Mold is Equitably Estopped from Claiming that Beachmold Mexico was a Separate and Independent Entity

"Equitable estoppel 'precludes a party from exercising contractual rights because of his own inequitable conduct toward the party asserting the estoppel.'" *Paul v. Detroit Edison Co.*, 94 F. Supp. 3d 880, 887 (E.D. Mich. 2015), *aff'd sub nom. Paul v. Detroit Edison Co. & Michigan Consol. Gas Co. Pension Plan*, 642 F. App'x 588 (6th Cir. 2016)(quoting *Bloemker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436, 442 (6th Cir. 2010). "Equitable estoppel operates to place the person entitled to its benefit in the same position he would have been in had the representations been true." *CIGNA Corp. v. Amara,* 131 U.S. 421, 131 S.Ct. 1866, 1880, 179 L.Ed.2d 843 (2011) (internal quotation marks and citation omitted). In *Bloemker*, the Sixth Circuit set forth the elements of equitable estoppel as follows:

> "Under our precedent, the elements of an equitable estoppel claim are: 1) conduct or language amounting to a representation of material fact; 2) awareness of the true facts by the party to be estopped; 3) an intention on the part of the party to be estopped that the representation be acted on, *or conduct toward the party asserting the estoppel such that the latter has a*

*right to believe that the former's conduct is so intended*; 4) unawareness of the true facts by the party asserting the estoppel; and 5) detrimental and justifiable reliance by the party asserting estoppel on the representation." *Id*. at 442. (Emphasis added).

In *AFSCME v. Bank One*, 267 Mich. App. 281, 293, 705 N.W.2d 355, 363 (2005), the Court described the doctrine of equitable estoppel:

> "Equitable estoppel is ... a doctrine that may assist a party by precluding the opposing party from asserting or denying the existence of a particular fact. Equitable estoppel may arise where (1) a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on that belief, and (3) the other party is prejudiced if the first party is allowed to deny the existence of those facts." (Internal quotation marks and citations omitted).

In this case, Beach Mold now claims that Beachmold Mexico was a separate entity, and that Plaintiff consented to the tooling being shipped to Mexico. In effect, Beach Mold argues that because Plaintiff allegedly had knowledge of the separate corporate status of Beachmold Mexico, and agreed to have the tooling sent there, any obligation that Beach Mold had to return the tools ended upon their shipment to Mexico. However, the facts of this case show that because Beach Mold induced Plaintiff to believe otherwise, it should be equitably estopped from asserting that Beachmold Mexico was a separate company.

Looking at the first *Bloemker* factor–conduct or language amounting to a representation of material fact–the following facts show that Beach Mold in effect represented to Plaintiff that Beachmold Mexico was operated by, and existed under the same corporate umbrella as Beach Mold:

-The purchase orders from Beach Mold (Plaintiff's Exhibit A) state, "the supplier [Beach Mold] has quoted the design and manufacture of the tool in New Albany, IN and the molding from Queretero, Mexico." Nowhere do they indicate that Beachmold Mexico is a separate entity.

-10-

-The order for the "Top Hat Tool" that was manufactured by Advance states "the Top Hat Tool will run in production at Beach Mold in Queretero Mexico." It is significant that both the Indiana and Mexico facilities carry the same "Beach Mold" name. This language implies that "Beach Mold," as the Indiana corporation is known, owns and operates the Mexican facility.

-The price quotation (Plaintiff's Exhibit B) states that pricing was "based on parts being manufactured at *our* Queretaro, Mexico facility." (Emphasis added).

-The price quotation is on a Beach Mold & Tool, Inc. letterhead [Plaintiff's Exhibit B], *with no reference to* Beachmold Mexico, and bearing an address in Queretaro, Mexico:

> Plastic Molding, Precision Assembly,
> Production and Prototype
> La Griega102
> Parque Industrial Queretaro
> Santa Rosa Juarequi
> Queretaro,QRO, Mexico CP 76220

-Tammy Rickards, the account manager for Beach Mold, testified that she did not "go into details" with customers regarding the separate corporate existence of Beachmold Mexico, but that it was "listed as an option." However, she acknowledged that Beach Mold's website contained the following language in its first sentence, again implying that Beach Mold owns and operates the Mexican facility:

> "Beach Mold and Tool has brought total solutions capability south of the border with *its* newest facility in Queretaro, Mexico." *Rickard Dep.*, Plaintiff's Exhibit D, at 18, Pg. ID 2100. (Emphasis added).[4]

---

[4] Beach Mold has presented no evidence that any portion of its website identified Beachmold Mexico as a separate entity. Ms. Rickard testified:

Q:  Okay. Now, do you know whether in the website it was ever stated that the Beach Mold and Tool Queretaro, Mexico facility was not part of Beach Mold and Tool?

-Ms. Rickard testified that "in general" she told customers that "we [Beach Mold] had capabilities to produce parts in Mexico." *Id*. While she had a vague recollection of discussing the separate corporate status of Beachmold Mexico with some customers–Continental/Siemen's Video and Johnson Controls–she did not testify that she discussed the matter with Plaintiff.

-James Beal, Plaintiff's senior buyer, states in his affidavit that "[p]rior to Grammer's request for the Tooling, no representative of Beach Mold advised Grammer that Beach Mold's Mexico Facility had not been previously owned and controlled by Beach Mold." Plaintiff's Exhibit R, ¶ 14. As shown above, this sworn statement stands uncontradicted.

Again, *AFSCME v. Bank One*, 705 N.W.2d at 363, holds that equitable estoppel is applicable when "a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts." Viewing the above facts in combination, the Plaintiff–or any customer–would reasonably be led to conclude that the Mexican production facility was a wholly-owned division of Beach Mold & Tool, Inc. A neon sign would not have made it plainer.

Under the second *Bloemker* factor, Beach Mold was aware of the true facts, and under the fourth factor, Plaintiff was clearly *unaware* of the true facts. Under the third factor, Beach Mold's conduct, as outlined above, was such that Plaintiff had a right to believe that the misrepresentation of fact, whether intentional or negligent, would be acted upon–more specifically that Beach Mold intended that Plaintiff would agree to have the tooling sent to the Queretaro, Mexico facility for production of the parts. Finally, under the fifth factor, the Plaintiff detrimentally relied on the misrepresentation.

---

A:   I have no idea. *Id*. at 19, Pg. ID 2100.

Accordingly, Beach Mold should be equitably estopped from presenting facts showing that Beachmold Mexico was a separate entity, or from presenting legal arguments flowing from those facts.

### 3. Beach Mold Breached the Bailment Contract

"Under Michigan law, the elements of a breach of contract claim are: (1) the existence of a contract between the parties, (2) the terms of the contract require performance of certain actions, (3) a party breached the contract, and (4) the breach caused the other party injury." *Burton v. William Beaumont Hosp.*, 373 F.Supp.2d 707, 718 (E.D.Mich. 2005) (citing *Webster v. Edward D. Jones & Co. ., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999)).

It has been established that there was a bailment contract between Plaintiff and Beach Mold. It bears repeating that a bailment contract may be express or implied, formal or informal. *See Godfrey v. City of Flint*, 279 N.W. at 518 ("It is clear from the decisions that matters of form are usually of slight significance as far as the validity of a contract of bailment is concerned."). In its response to this motion, Beach Mold cites *Johnson Controls, Inc. v. TRW Vehicle Safety Systems, Inc.*, 491 F.Supp.2d 707 (E.D. Mich. 2007), which in turn quotes M.C.L. 440.2204(1) ("A contract for the sale of foods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."). This also supports Plaintiff's position that there was a contract, since an offer, such as the purchase orders in this case, can be accepted through performance. *See Caratron Industries, Inc. v. Bird Electron Beam Corp.*, 2007 WL 2852214 (E.D. Mich. 2007)("the 'offers' were the purchase orders invited by Defendant's price quotations and sent by Plaintiff, which Defendant, in turn, accepted through its performance.").

Implicit in the bailment contract was Beach Mold's duty to return the tooling on Plaintiff's request, at the conclusion of the FCA project. Beach Mold did not do so; thus, it breached the contract. Finally, Plaintiff was injured by the breach, since it had to reimburse FCA the cost of the tooling.

Beach Mold refers to the declaration of James J. Mahoney, appended to its motion to dismiss [Doc. #102] as Exhibit 2, in support of its theory that Beachmold Mexico returned the tooling to Plaintiff. However, Mr. Mahoney's statement that the tooling was returned is not based on his personal knowledge, but rather is the product of speculation. Mr. Mahoney states, at ¶ 7, "Further, it is *my reasoned belief* that all G MEX [Grammar] owned property was returned to them prior to their payment of all open accounts receivable." (Emphasis added). In the same declaration, he states that he first consulted with Beachmold Mexico in August of 2013, yet opines that the tooling was returned in February of 2013, six months previously. His statement that the tooling was returned could not be based on personal knowledge.

In *Graham Med. Techs., LLC v. Akron Med., Inc*., 2011 WL 1899230, at *3–4 (E.D. Mich. 2011), the Court explained why speculative declarations such as Mr. Mahoney's cannot support an issue of material fact in a summary judgment motion:

> The Court, however, finds that Hastings's declaration, which offers little more than conclusory allegations, fails to demonstrate a genuine dispute as to whether Defendant returned the inventory. See *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir.2009) ("[T]he party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary."); *Sigmon v. Appalachian Coal Props., Inc*., No. 08–6258, 2010 U.S.App. LEXIS 19493, at *14–15, 2010 WL 3736276 (E.D.Mich. Sept. 17, 2010) ("Given this dearth of specifics, it cannot be said that the affidavits offer anything beyond conclusory allegations and bald conclusions of law. Therefore, the affidavits alone are insufficient to create a genuine issue of material fact as to the existence of an oral sales agreement."). Furthermore, Fed.R.Civ.P. 56(c)(4) requires that "[a]n

affidavit or declaration used to support or oppose a motion must be made on personal knowledge, [and] set out facts that would be admissible in evidence ...." Given Hastings's medical condition and his admission that he has not been able to review any documents or exhibits necessary to defend against Plaintiff's motion, it is unclear to the Court how Hastings's declaration that Defendant has returned all inventory to Plaintiff is based on his personal knowledge.

Under these facts, including the application of equitable estoppel, no rational trier of fact could find in favor of Beach Mold. Summary judgment should therefore be granted on the breach of contract claim.

### B. Conversion

Apart from its breach of contract claim, Plaintiff is entitled to summary judgment on its claim of common law conversion.

In *Graham Med. Techs., LLC v. Akron Med., Inc.*, 2011 WL 1899230, *6 (E.D. Mich. 2011), the Court explained conversion under Michigan law as follows:

> "The tort of conversion is defined as ' "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein."' *Prime Fin. Servs. LLC v. Vinton*, 279 Mich.App. 245, 275, 761 N.W.2d 694 (2008) (quoting *Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 391, 486 N.W.2d 600 (1992))."

The Michigan Supreme Court defines conversion as "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *In re Pixley,* 456 B.R. 770, 787–88 (E.D. Mich. 2011) (quoting *Dep't of Agric. v. Appletree Mktg., L.L.C.*, 485 Mich. 1, 779 N.W.2d 237, 244 (2010); *Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 486 N.W.2d 600, 606 (1992)). Moreover, in *In re Dantone*, 477 B.R. 28, 38–39 (B.A.P. 6th Cir. 2012), the Court held that under Michigan law, conversion can be committed without a finding of intentionality, or even negligence:

> "No intent to violate the property rights of another, or knowledge that another's property rights are being violated, is required. *In re Pixley*, 456 B.R. at 788 (citing Michigan case law). The tort can be committed 'unwittingly.' *See Foremost Ins. Co.*, 486 N.W.2d at 606. '"[N]either good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action."' *In re Pixley*, 456 B.R. at 788 (quoting *J. Franklin Interests, L.L.C. v. Meng*, Docket No. 296525, 2011 WL 4501841, at *9 (Mich.Ct.App. Sept. 29, 2011))."

A claim for conversion can be brought independent of whether there is an underlying contract, or a parallel contract action. In *Graham Med. Techs.*, The plaintiff provided inventory on consignment to the defendant, who agreed to sell the devices on commission. The agreement could be terminated by either party on 30 days notice. Plaintiff properly terminated the arrangement, and requested return of the outstanding inventory that defendant held on consignment. When the property was not returned, plaintiff sued for breach of contract and conversion. The Court held as follows:

> "While Defendant undertook a contractual obligation to return Plaintiff's inventory upon Plaintiff's request following termination of the Agreement, Defendant's failure to return the inventory breached a duty separate and distinct from the breach of contract. Given the bailment situation, in which Defendant was entrusted with Plaintiff's inventory, Defendant had a separate tort obligation to refrain from taking actions inconsistent with Plaintiff's ownership interest in the inventory, which would exist if there were no contract at all. Therefore, the Court finds that Plaintiff may maintain a conversion claim in addition to its breach of contract claim. Since Defendant does not raise any additional defenses to this claim, summary judgment is appropriate."

Beach Mold's defense to the conversion claim is based on its contention that Plaintiff was aware that the Mexican facility was a separate corporation, and consented to having the tooling sent there. But as discussed above, Beach Mold is equitably estopped from making that claim. Having effectively induced Plaintiff to believe that the Mexican facility was part of Beach Mold, the Defendant cannot now wash its hands of its duty to return the tooling. As in *Graham Med. Techs.*, Beach Mold has not proffered any additional defenses to Plaintiff's conversion claim, and summary judgment should

-16-

therefore be granted to Plaintiff.

However, while Plaintiff is entitled to summary judgment on its claim for common law conversion, it is not entitled to summary judgment on a claim of statutory conversion under M.C.L. § 600.2919a(1)(a), which provides for triple damages. Beach Mold correctly notes that Plaintiff did not specifically plead statutory conversion. But even if it had, Plaintiff has not met the elements of the statute, which provides as follows:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> (a) Another person's stealing or embezzling property or converting property to the other person's own use.

Plaintiff has not pled, nor has it presented any evidence that Beach Mold stole or embezzled the tooling, or converted it to its own use. This was precisely the situation in *Graham Med. Techs*, where the Court denied summary judgment on a statutory conversion claim:

> "In order for Plaintiff to prevail on its statutory conversion claim, Plaintiff must prove that the inventory was stolen, embezzled, or converted to Defendant's own use. While Plaintiff has presented evidence showing that Defendant has failed to return its inventory—an act inconsistent with Plaintiff's ownership interests sufficient to prove common law conversion—Plaintiff has failed to demonstrate that the inventory was stolen, embezzled or converted to Defendant's own use for purposes of statutory conversion. In fact, Plaintiff has presented no argument or evidence with respect to what has happened to the inventory and, by all accounts, neither party is aware of the inventory's location at this point. Thus, Plaintiff has failed to demonstrate that it is entitled to summary judgment with respect to its statutory conversion claim. Accordingly, Plaintiff is not entitled to treble damages at this stage of the proceedings."

Plaintiff in this case is not entitled to triple damages, costs, and attorney fees as provided for in the statute.

## IV. CONCLUSION

I recommend that Plaintiff's motion for partial summary judgment [Doc. #114] be GRANTED IN PART AND DENIED IN PART, as follows:

That summary judgment against Defendant Beach Mold & Tool, Inc. be GRANTED as to Plaintiff's claim for breach of contract (Count I) and common law conversion (Count II).

That Plaintiff be awarded the sum of $136,560.00, representing the value of the tooling.

That summary judgment be DENIED as to any claim for statutory conversion.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

                                                                            s/ R. Steven Whalen
                                                                            R. STEVEN WHALEN
                                                                            UNITED STATES MAGISTRATE JUDGE

Dated: August 26, 2018

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was sent to parties of record on August 26, 2018, electronically and/or by U.S. mail.

                                                                            s/Carolyn M. Ciesla
                                                                            Case Manager to the
                                                                            Honorable R. Steven Whalen